**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PITTSBURGH LEAGUE OF YOUNG | ) | |
| VOTERS EDUCATION FUND and | ) | |
| AMERICAN CIVIL LIBERTIES | ) | |
| FOUNDATION OF PENNSYLVANIA, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 02: 06-cv-1064 |
| | ) | |
| PORT AUTHORITY OF ALLEGHENY | ) | |
| COUNTY and ANTHONY J. HICKTON, | ) | |
| Director of Sales, | ) | |
| | ) | |
| Defendants. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiffs, Pittsburgh League of Young Voters Education Fund and American Civil Liberties Foundation of Pennsylvania, commenced this lawsuit by the filing of a Complaint pursuant to 42 U.S.C. § 1983 against Defendants, Port Authority of Allegheny County ("Port Authority") and Anthony J. Hickton ("Hickton"), Director of Sales, in which Plaintiffs allege that Defendants violated their rights under the First and Fourteenth Amendments to the United States Constitution by refusing to accept and display their proposed ex-offender voter education advertisement.  Plaintiffs seek injunctive relief as well as monetary damages.

On December 8, 9, 10, 11, and 18, 2008, the Court conducted a non-jury trial and heard witness testimony and evidence.  All parties were represented by counsel who presented and argued the issues skillfully and effectively.  The transcript of the proceedings was filed on January 12, 2009.  Proposed Findings and Fact and Conclusions were to be filed on or before March 13, 2009, and responses in opposition were to be filed on or before March 27, 2009, which were timely filed by all parties.  The matter is now ripe for disposition.

Based on the testimony and evidence presented during trial and the applicable law, the Court enters the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).  For the reasons that follow, the Court finds in favor of Plaintiffs, Pittsburgh League of Young Voters Education Fund and American Civil Liberties Foundation of Pennsylvania.

### FINDINGS OF FACT

### Parties

1.      Pittsburgh League of Young Voters Education Fund ("League") is a non-profit organization under Section 501(c)(3) of the Internal Revenue Code.  The League is a local affiliate of the national organization League of Young Voters Education Fund, which is not a Section 501(c)(3) organization.

2.      The League's "core program is to build permanent comprehensive youth engagement and leadership development organizations in six states," including Pennsylvania. "Each local [League of Young Voters Education Fund] affiliate conducts a comprehensive year-round program which includes outreach, leadership development, training, arts-based organizing, alliance building and non-partisan voter engagement. . . ."  Pl.  Ex. 30.

3.      American Civil Liberties Foundation of Pennsylvania (the "ACLU")[1]  is a non-profit organization under 501(c)(3) of the Internal Revenue Code.  Its mission is to defend

---

[1]      The acronym "ACLU" generally refers to both, or either, the American Civil Liberties Foundation of Pennsylvania and/or the American Civil Liberties Union. *See* Trial Testimony of Barbara Feige.  Accordingly, the Court will hereinafter interchangeably use the acronym "ACLU" to refer to the American Civil Liberties Foundation of Pennsylvania and/or the American Civil Liberties Union.

2

and enforce constitutional rights.  In addition to providing legal services to people who believe their rights have been violated, the ACLU provides public education, speakers, advocacy, and other services around issues of civil rights and liberties.  The ACLU is affiliated with the American Civil Liberties Union, a separate corporation that is not a Section 501(c)(3) organization.

4.     The ACLU has litigated a number of cases which involve women's rights, young people's rights, voting rights, and housing rights.  The ACLU does not charge clients for any of its services, including legal representation.

5.     The ACLU sometimes provides direct legal representation in matters for which, as a prevailing party, it may by statute be entitled to an award of fees and costs against the opposing party.  An award of fees and costs is routinely sought in fee generating cases.

6.     Whether an award of fees and costs may be available, however, does not factor into the decision of whether the ACLU will provide direct legal representation.  In matters for which no award of fees or costs is available, the ACLU is neither compensated for its work nor reimbursed for its expenses.

7.     Some of the ACLU's litigation is performed by private counsel who represent ACLU clients as "cooperating lawyers."  Should a cooperating lawyer obtain an award of attorney's fees, a portion of that award is shared with the ACLU.

8.     The Port Authority of Allegheny County ("Port Authority") is a governmental agency created pursuant to state law and it owns and operates the bus and rail mass transportation system in Allegheny County.

9.    Anthony J. Hickton ("Hickton") held the position of Director of Sales for Port Authority from July 2004 until he retired on March 1, 2007.  As Director of Sales, Hickton had the authority to approve or disapprove the sale of proposed advertisements appearing on and in Port Authority vehicles.

### Advertising on Port Authority Vehicles

10.    The advertising revenue of Port Authority, which totals approximately $1.5 million per year, is less than one-half of one percent  of Port Authority's annual intake revenues of approximately $350 million.  Two-thirds of Port Authority's intake revenues are comprised of funding received from the Commonwealth of Pennsylvania, Allegheny County, and the federal government.  Port Authority also obtains additional revenue through the sale of advertising space in and on its buses and rail vehicles.

11.    The Port Authority advertising space includes spaces for cards called "interior bus cards" above the seats along the upper internal side walls of its vehicles.   Port Authority has space for approximately 16,000 interior bus cards, but only about  20% of the available spaces are occupied by advertisements at any given time.

12.    Port Authority maintains a written formal Advertising Policy, which has been in effect since March 27, 1998.  The Advertising Policy was prepared by outside legal counsel and adopted by the Port Authority Board of Directors.  The Advertising Policy provides as follows:

> It shall be the policy of Port Authority of Allegheny County to accept commercial advertising for posting in and on Port Authority vehicles and other property owned or controlled by Port Authority, of its sole choosing, with the objective of maximizing revenue while maintaining standards of

decency and good taste without infringing on First Amendment rights of Prospective Advertisers.  Accordingly, Port Authority will not accept advertisements that are obscene, unlawful, misleading, libelous, or fraudulent.  <u>Further, Port Authority will not accept advertisements that are non-commercial</u>; that appeal to prurient interests, <u>that are or may be offensive to riders</u>; that glamorize or otherwise promote violence, sexual conduct, alcohol, or tobacco use; <u>that are political in nature or contain political messages</u>; or that are reasonably determined not to be in good taste.  This policy is intended to be an objective and enforceable standard for advertising that is consistently applied.  It is also Port Authority's declared intent not to allow any of its Transit Vehicles or Property to become a public forum for dissemination, debate or discussion of public issues.

(Advertising Policy, emphasis added.)

13.     The Advertising Policy is devoid of definitions for any of its operative terms and Port Authority has never adopted guidelines which specifically define policy terms such as "commercial," "non-commercial," "offensive," "political in nature," or "political messages."

14.     Since adopting the Advertising Policy, Port Authority has not accepted any political advertisements on its vehicles.

15.     The Advertising Policy pertains to advertisements that Port Authority accepts from third parties, and does not preclude Port Authority from placing its own messages on Port Authority vehicles.  *See* Pl. Exh. 48; and Def. Exh. 53.

16.     Prior to January 2004, Port Authority did not have its own advertising department, but rather retained outside advertising vendors who specialized in selling public transportation advertising.

17.     Transportation Displays, Inc., and its successor Viacom Outdoor ("Viacom") originally served as the outside advertising vendor for Port Authority.  In July 2003, Obie Media replaced Viacom as the outside advertising vendor for Port Authority.

18.     As the Manager of Sales, Hickton served as the Port Authority liaison with its outside advertising vendors.  At all times, however, Port Authority retained ultimate control of its vehicle advertising and Hickton reviewed each advertisement prior to its installation.

19.     In January 2004, Port Authority elected to bring the advertising in-house on a permanent basis.  Hickton was thereafter promoted to Director of Sales and hired staff to assist in administering the advertising program.  Prior to his promotion, Hickton had been a salaried employee.  Upon becoming Director of Sales, he received a salary plus a commission on every revenue dollar that Port Authority generated through advertising.

20.     When Hickton was presented with an advertisement, he would initially apply his own judgment to determine whether it satisfied the terms of the Advertising Policy.  If he did not have any questions as to whether the advertisement satisfied the Advertising Policy, he had the authority to independently authorize or reject it.  If Hickton had questions with regard to a proposed advertisement or the Port Authority Advertising Policy, he would consult with the Port Authority's marketing department and/or Christopher J. Hess ("Hess"), in-house counsel for Port Authority .

21.     In 1994, Hess was employed by Port Authority as a senior staff attorney.  In August 2006, he was promoted to the position of assistant general manager of legal and corporate services, where his responsibilities included direct oversight of Port Authority's legal department.   Hess left Port Authority's employment in the latter part of 2008.

22.      If a potential advertiser had questions about the Advertising Policy and/or questions about the interpretation of the Advertising Policy, Hickton would refer that advertiser to Port Authority's legal department.

23.     Port Authority and Hickton did not review the text and/or content of each proposed advertisement to determine if it was permitted under the Advertising Policy.  Based on discussions with potential advertisers, Defendants were often able to determine whether a prospective advertisement would be permitted or prohibited without seeing the text or content of the advertisement.  Such occurred in this matter.

## Port Authority Advertising Policies and Practices

24.     According to Hickton, an acceptable "commercial" advertisement (i) had to have, or be about, an event with an admission price, (ii) involve a sale of goods, or (iii) offer an exchange of goods or services.

25.     Port Authority accepted an advertisement from Animal Friends and the Humane Society offering a $5,000 reward for information leading to the arrest and conviction of people involved in dogfighting.  Pl. Ex. 59.   Port Authority considered the advertisement to be commercial because it offered a monetary reward.

26.     On occasion, Port Authority sponsors or co-sponsors advertisements on its vehicles that it believes to be consistent with its business by encouraging or facilitating ridership.  Port Authority has also co-sponsored advertisements which involve services (such as literacy services).  Port Authority has no written standards by which it determines the non-commercial advertisements on which it will place its logo.  Even when Port Authority places its logo on a non-commercial advertisement, the advertisement sponsor is still required to pay for the advertising space.   However, when co-sponsoring, Port Authority often shares in the costs

by charging discounted rates, charging for only a portion of time that the ads would run, or charging for only a limited number of the ads.

   27. Examples of non-commercial advertisements that Port Authority has authorized and co-sponsored are as follows:

   • An advertisement from Read 365 which encouraged adults to read to children. Pl. Exh. 45;

   • An advertisement from Carnegie Library which encouraged individuals to use the resources and services available at the library's new Woods Run facility.  Pl. Exh. 46;

   • An advertisement from Hearing and Deaf Services, Inc., which encouraged individuals to have their hearing tested.  Pl. Exh. 47;

   • An advertisement from United Way.  Pl. Exh. 50;

   • An advertisement from Tobacco Free Allegheny soliciting individuals who want to quit smoking to utilize the services of Tobacco Free Allegheny.  Pl. Exh. 57;

   • An advertisement from the City of Pittsburgh Police promoting their joint task force aimed at eliminating illegal video gambling in Pittsburgh bars.  Pl. Exh. 58; and

   • An advertisement from Allegheny County, the City of Pittsburgh, and other sponsors regarding early childhood development programs.  Pl. Exh. 61.

   28. Port Authority believes that a non-commercial advertisement sponsored by some entity other than Port Authority becomes "government speech" that is neither commercial nor non-commercial if Port Authority merely adds its own logo to the advertisement.  Examples of advertisements that Port Authority has added its own logo and accepted as government speech are as follows:

•       An advertisement from Allegheny County Department of Human Services, Family Resources, and A Child's Place at Mercy regarding child abuse and domestic violence. Pl. Exh. 65;[2]

•       An advertisement from Job Corps, a federal government program in which employers advertise job openings.  Pl. Exh. 48;

•       An advertisement from the Allegheny County Health Department encouraging individuals to receive immunizations for whooping cough and meningitis.  Pl. Exh. 60;

•       An advertisement for the Alliance for Infants and Toddlers that solicited the use of the organization's healthcare-related services.  Pl. Exh. 67;[3]

29.     In early 2005, Hickton approached Hess with the idea of increasing advertising revenues by making interior bus card advertising space available for sale to other government entities.  In the past, Port Authority had not accepted advertisements from government agencies unless those ads were otherwise permitted under the Advertising Policy.

30.     These government agencies - including agencies created by the City of Pittsburgh, Commonwealth of Pennsylvania, Allegheny County, and the federal government - were the funding partners which provided the majority of Port Authority's intake revenues.

---

[2]     Hickton retired from Port Authority before it ran the advertisements involving Tobacco Free Allegheny, the Port Authority /City of Pittsburgh anti-gambling task force, the early childhood development programs, and child abuse and domestic violence services.

[3]     Hickton retired from Port Authority before it ran either the Allegheny County advertisement for immunizations or the Alliance for Infants and Toddlers advertisement.

31.     Hess prepared a legal memorandum, dated August 15, 2005, in which he concluded that such advertisements would constitute government speech that could be exempted from the Advertising Policy restrictions.  Hess further concluded that Port Authority could accept advertisements about the availability of government agencies' services or programs without opening up the Port Authority advertising space to private citizens with similar messages, regardless of whether the advertisements were commercial or non-commercial.  *See* Def. Exh. 53.

32.     After Hess prepared the legal memorandum, Port Authority began to accept advertisements from government entities as permitted "government speech" under its Advertising Policy.

### Just Harvest Advertisement

33.     Just Harvest is a non-profit organization that works to eliminate hunger and poverty in the Pittsburgh area.  In furtherance of its mission, it works to advance public policy initiatives of interest to it.

34.     Through a program referred to as "Just Vote," Just Harvest is engaged in voter registration efforts and mobilization to encourage low-income individuals to vote.

35.     Just Harvest also provides free income tax preparation assistance to people who meet certain eligibility criteria.  Income tax returns are prepared by Just Harvest as a community service.  Funding for the income tax preparation program is provided by government agencies, foundations, religious organizations, and corporate philanthropy.

10

36.     In early 2003, Just Harvest sought to advertise its free income tax preparation program on Port Authority buses.  Viacom, the entity serving as the outside advertising vendor for Port Authority at the time, rejected the proposed advertisement on the basis that it was non-commercial.

37.     In late 2003, Obie Media (which had replaced Viacom) reversed the Viacom decision and agreed to run the Just Harvest advertisement.  The free income tax preparation advertisement was displayed in late 2003 and early 2004.

38.     The Just Harvest advertisement featured the words "Free Tax Preparation." Jt. Exh. 22.  It stated at the top: "Give your paycheck a boost.  Get Free Money." *Id.*  The advertisement further stated that Just Harvest would prepare "SIMPLE" tax returns free of charge for low-income individuals and families.  *Id.*

39.     Hess did not play any role in the decision to accept the Just Harvest advertisement.  However, he testified at trial that he interprets the advertisement to be commercial because individuals would receive money by using the free services of Just Harvest.  He also presumed that Just Harvest charged its clients for more complicated tax returns.

40.     Just Harvest's budget for its tax preparation service program is between $80,000 and $90,000 per year.  Virtually all of that funding comes from government sources. Although Just Harvest receives governmental funding, it was the sole sponsor of its advertisement.

41.     The Court finds that the Just Harvest advertisement was not government speech and was non-commercial.  The Just Harvest advertisement was designed to inform low-

income earners about the potential eligibility for income tax credits and refunds as well as the availability of free tax-preparation services.

**Fair Housing Partnership / Pittsburgh Commission on Human Relations Advertisement**

42.     The Fair Housing Partnership ("FHP") is a non-profit organization that promotes fair housing through education, outreach, assistance to victims of housing discrimination, advocacy, and counseling.

43.     During the 2000 - 2005 time period, FHP occasionally represented clients in litigation and also referred clients who had been victims of housing discrimination to local attorneys.  FHP does not currently charge its clients for its services; it will attempt, however, to collect costs and attorneys' fees on the rare occasions when it litigates a housing discrimination case and an award of attorneys' fees is statutorily available.   During the 2004-2005 time period, FHP and the local attorneys may have charged those clients for their services.

44.     The Pittsburgh Commission on Human Relations (the "Commission") is the official City of Pittsburgh agency that investigates violations of the City's anti-discrimination ordinance and enforces that ordinance.  The Commission is not paid for its services.

45.     In 2001-2002, the Commission sought to place a public service announcement on Port Authority vehicles to "educate the public with regard to their rights and responsibilities in employment, housing, and public accommodations." Jt. Exhs. 3-4.  On a number of occasions, Port Authority rejected the request of the Commission to place advertisements about its activities on Port Authority vehicles.

46.     Although the Commission is a governmental agency, Port Authority refused to run Commission advertisements because it considered them to be non-commercial.  The Commission requested that Port Authority make an exception to its Advertising Policy to permit non-commercial advertisements from government entities, but Port Authority declined to do so.

47.     Charles Morrison, the Director of the Commission, contacted the FHP and negotiated the terms of submitting a joint housing discrimination advertisement to Port Authority.

48.     In 2004, Mary Hamilton, an employee of FHP, contacted  Port Authority about the possibility of placing an advertisement co-sponsored by FHP and the Commission. The purpose of the FHP / Commission advertisement was to inform the public that housing discrimination is illegal on the basis of race, gender, children, color, religion, age (over 40), national origin, disability, and sexual orientation, and to provide people with phone numbers where "help" could be obtained.  The advertisement encouraged individuals who suspected that they had been the victim of housing discrimination to contact FHP or the Commission to receive help.

49.     It was not clear to Hickton that the advertisement was commercial in nature. Accordingly, he asked Leigh Yock ("Yock"), a sales associate with Port Authority, to obtain more information.  After following up with FHP, Yock informed Hickton that FHP would provide or otherwise obtain attorneys to provide legal services to victims of housing discrimination and that those attorneys would be paid.

50.     Hickton then approved the advertisement as a commercial advertisement. The ad ran on Port Authority vehicles from November 2004 through February 2005.

51.     The Court finds that the FHP / Commission advertisement was a non-commercial advertisement primarily designed to inform readers that they have a right to not be subjected to housing discrimination.


**Women's Law Project Advertisement**

52.     The Women's Law Project ("WLP") is a non-profit public interest legal advocacy organization that seeks to advance the legal, social, and economic status of women through public education, counseling, legislative advocacy, and legal representation.

53.     The WLP does not charge its clients for any assistance or service provided by the organization.

54.     Among the legal activities performed by WLP is the provision of free information in response to questions regarding legal rights.  WLP provides legal representation for both plaintiffs and defendants in legal disputes.

55.     If representation is provided in litigation and if attorneys' fees and costs are available through a fee shifting statute, WLP may petition the court for an award of fees and costs.  The compensation that WLP receives for its legal services represents up to twenty percent (20%) of its annual operating budget.  However, decisions to provide legal representation are made by WLP without regard to the potentiality of recovering attorney fees and costs.

56.     When WLP works with co-counsel in litigation matters, its co-counsel occasionally also receives compensation.  WLP also refers women to private attorneys or legal organizations who charge fees for their legal services.

57.     In the Spring of 2005, WLP sought to run an advertisement on Port Authority buses.  The target audience of the proposed advertisement was young women and the intended purpose of the advertisement was to get the name of WLP out into the community and to let women people know of an available resource for obtaining free legal information.  It was not the intent of WLP to acquire additional fee generating legal cases by advertising on Port Authority buses.

58.     Through a program referred to as "Women Vote PA," WLP engages in voter education, registration, and mobilization to encourage women to vote.  WLP's proposed advertisement, however, had nothing to do with the Women Vote PA program.

59.     Hickton had not seen any proposed advertisement text or graphics of the WLP advertisement, but he refused to accept the advertisement when he learned that there was no fee attached to WLP assistance.  The position of Port Authority was that such an advertisement would violate the commercial only aspect of its Advertising Policy.

60.     Susan Frietsche ("Frietsche"), a senior staff attorney with WLP, did not understand the distinction Port Authority was making between commercial and non-commercial advertisements, especially in light of other advertisements she had seen as a Port Authority bus rider.  Hickton directed Frietsche to contact Hess.

61.     Frietsche advised Hess that WLP occasionally receives compensation for its litigation services under fee-shifting statutes.  Hess reviewed WLP's internet website, which

confirmed that the organization represents women in discrimination matters free of charge, but then may seek to recover counsel fees under fee-shifting statutes, if available.

62.     Hess did not accept WLP's proposed advertisement based upon his initial telephone conversation with Frietsche, but informed her that he and Hickton would "work with her and her organization to try to put together an advertisement that would elicit a commercial message or purpose acceptable under the advertising policy. . . ."  Jt. Exh. 13.

63.     Frietsche sent a draft WLP bus advertisement to Hess following his offer to assist WLP in developing an acceptable advertisement under the Policy.  Hess made specific language suggestions to the text of the proposed advertisement.  For example, he wanted the word "free" omitted from the advertisement and the phrase "legal information" changed to "confidential legal services."  The advertisement did not identify any specific right that young women possess.

64.     Frietsche believed the phrase "free legal information" more accurately described what WLP wanted to advertise and she thought her draft language would be less intimidating to young women.  However, she agreed to Hess's suggested language changes in order to have the advertisement accepted and placed on Port Authority's buses.

65.     Port Authority accepted and displayed the WLP advertisement which contained the language suggestions proposed by Hess.  The revised advertisement stated, "just because you're YOUNG doesn't mean you don't have RIGHTS," and a phone number was provided below the words, "Call the Women's Law Project for confidential legal services."  Jt. Exh. 16.

16

66.     The Court finds that the WLP advertisement was non-commercial.  The WLP advertisement was designed to educate young women about their rights and was not motivated by any intention to generate fee producing legal activity through its message.

### The Ex-Offender Voting Rights Project

67.     The Commonwealth of Pennsylvania, pursuant to state law, permits a convicted felon whose sentence included a period of incarceration to vote in primary and general elections as soon as the felon has been released from prison, even if the ex-offender is on parole or probation.[4]

68.     Despite the existence of the statutory right of ex-offenders to vote in Pennsylvania elections, there remains confusion in the community regarding the status of that right primarily because Pennsylvania law has changed a number of times and there are differences in the laws among various states.  For example, in some states, ex-offenders are not immediately permitted to vote upon release from prison, but can vote after a certain period of time has passed.   This confusion has apparently resulted in a number of local county election officials and parole or probation officers advising ex-offenders in Pennsylvania that they do not have the right to vote.

69.     In October 2005, the Coalition of Concerned Citizens ("Coalition"), a loose knit coalition of local organizations, was formed to address the ongoing misinformation and educate the public about the right of ex-offenders to vote in Pennsylvania.  Coalition members

---

[4]     In Pennsylvania, convicted felons while serving a period of incarceration do not have the right to vote.

included the League; the ACLU; One Vision One Life, an Allegheny County Department of

Human Services anti-violence program; the Black Political Empowerment Organization; and

the Millions More Movement of the Nation of Islam.

70.     The ex-offender project was comprised of three components to get ex-

offenders to vote: educating ex-offenders of their voting rights, assisting them in registering to

vote, and mobilizing them to exercise their right to vote.

71.     Among the services which the Coalition and its members wanted to provide

were public education, outreach to targeted populations, literature distribution, voter

registration, and the provision of legal services should someone who possesses the right to vote

be denied his or her franchise.  As part of the Coalition, the ACLU was involved in public

education regarding voting rights and in obtaining funding for the ex-offender voting rights

project.

72.     The Coalition desired to run ex-offender voting rights advertisements on Port

Authority buses because their research indicated that generally ex-offenders had limited

economic means, that ex-offenders were likely bus riders; and it was known that Port Authority

buses travel through a variety of neighborhoods where ex-offenders may likely live.

Accordingly, the Coalition believed that advertising on Port Authority vehicles would be an

effective means of educating ex-offenders of their voting rights.

73.     Lisa Rachlin (nee Krebs) ("Rachlin") worked for the League on a part-time

basis from May through November 2006.  Rachlin was also employed by the ACLU between

2005 and 2007 as a community education organizer.  She worked part time for the ACLU until

18

November 2006, at which time she discontinued her League employment and became a full-time employee of the ACLU.

74.     Rachlin worked on the ex-offender voting rights project in her capacity as an employee of both the League and the ACLU and she was the primary ACLU representative in the Coalition.

75.     Barbara Feige ("Feige") was the director of the ACLU and was the direct supervisor of Rachlin.  Her responsibilities included fund-raising, membership development, oversight of public education services, and working with community organizers and groups on civil liberties issues.

76.     The ACLU, through Feige, submitted two (2) funding proposals to local foundations on behalf of the ex-offender voting rights project, *to wit*: the Maurice Falk Fund and The Three Rivers Community Foundation.  Any funds received from these two proposals were to be applied to the Coalition efforts.

77.     The express purpose of the Maurice Falk Fund proposal was to obtain funding for Port Authority bus advertisements relating to the overall awareness of the ex-offender voting rights project, specifically public education, voter registration, and voter mobilization.  Jt. Exh. 17.  The purpose of The Three Rivers Community Foundation proposal was for the actual peer-to-peer outreach part of the ex-offender voting rights project.  Funds received from The Three Rivers Community Foundation would go to voter outreach and voter registration.  *See* Jt Exh. 20.

78.     The Maurice Falk Fund proposal was granted.  Although the proposal sought Two Thousand Dollars ($2,000.00),  Two Thousand Five Hundred Dollars ($2,500.00) was

awarded.  Feige testified that the Maurice Falk Fund grant award represented the first time in her experience that a foundation gave more money to the ACLU than had been requested.

79.     The Three Rivers Community Foundation proposal was also granted and the ACLU was awarded $2,000.00.  Money received from The Three Rivers Community Foundation was not to be used for advertising.

80.     Plaintiffs sought to run a Port Authority bus advertisement that explained Pennsylvania law regarding ex-offender voting rights and that provided contact information as to where people who had questions concerning, or problems exercising, their rights could get help or information.

81.     It is not disputed that the proposed advertisement was a non-commercial public service announcement.

82.     Rachlin was the Coalition member who was responsible for contacting the Port Authority.  She testified that she sent an email to Hickton to inquire about purchasing a Port Authority bus advertisement concerning the right of ex-offenders to vote in Pennsylvania. Rachlin's emails identified her as the ACLU community education organizer and contained her ACLU email address, as well as the ACLU mailing address and telephone number.

83.     Rachlin received no response from Hickton to her e-mail; she then telephoned Hickton in late 2005 and left a message for him with her ACLU telephone number.

84.     Hickton returned Rachlin's telephone call and informed Rachlin that an advertisement regarding voting rights was non-commercial and, therefore, prohibited by the Advertising Policy of the Port Authority.  Hickton did not review any draft ex-offender voting rights advertisement, as none had been prepared.  Additionally, Hickton testified that he

believed that it would be impossible to phrase an ex-offender voting rights advertisement in such a way as to make it acceptable under the Advertising Policy so it was not necessary for him to see a copy of the proposed text and/or graphics to determine that the proposed advertisement was prohibited under the Advertising Policy.

85.    On December 1, 2005, Rachlin sent Hickton another email, in which she requested a copy of the Port Authority Advertising Policy and reminded Hickton that he had rejected her previous request "on the grounds that the Port Authority could only place advertising with a commercial purpose." Jt. Exh. 19.  Hickton referred Rachlin's request for a copy of the Advertising Policy to Hess.

86.    By e-mail dated December 9, 2005, Hess sent Rachlin a copy of the Advertising Policy and stated: "If you would like to discuss any legal or policy issues related to this policy, please don't hesitate to give me a call." Jt. Exh. 23.

87.    On December 12, 2005, Rachlin sent out an e-mail to a number of ACLU volunteers and interns informing them that they were "looking into challenging a Port Authority advertising policy."   Rachlin explained that "Port Authority is refusing our request for the busses to run a public service announcement about ex-felon voting rights, on the grounds that they only accept advertisements of a commercial nature."  Rachlin requested  help in collecting as many examples of non-commercial advertising as possible.  Jt. Exh. 24.

88.    On January 25, 2006, Khari Mosley ("Mosley"), on behalf of the Coalition and the League, sent Hickton a letter in which he inquired about the purchase of Port Authority bus advertising space for an ex-offender voting rights advertisement.  Jt. Exh. 10.   Mosley explained that the Coalition was "developing a public-education campaign regarding the voting

rights of ex-offenders" and that "[o]ur message is not politically partisan; instead, we are interested in educating the target constituency about their voting rights." *Id*.

89.     At that time, Mosley worked for the League and its associated organization, the Pittsburgh League of Young Voters.  He held the position of state director and was the senior staff person.  His responsibilities included staff management, assistance with programming, strategic management, organizational development, and fund-raising.  Currently, Mosley is employed as the national field and political director for the National League of Young Voters.

90.     When Hickton received the letter from Mosley, he provided a copy to Hess and advised Hess that he had previously rejected the Coalition's proposed ex-offender voting rights advertisement.

91.     In a follow-up telephone call, Hickton informed Mosley that such an advertisement would not be accepted due to the requirement that all advertisements on Port Authority vehicles must be commercial.

92.     Hickton explained that if Port Authority accepted certain categories of advertisements, then it might create a public forum and be forced to accept a variety of advertisements that could be offensive to riders.  As examples, Hickton cited advertisements sponsored by the Ku Klux Klan and/or anti-abortion groups that Port Authority might be forced to accept.

93.     Because the requests of both Rachlin and Mosley had been rejected, on February 24, 2006, Attorney Marc L. Sternberger, Cooperating Attorney for the ACLU of PA, and Witold J. Walczak, Legal Director, ACLU of Pennsylvania, sent a letter to Dennis Veraldi

("Veraldi"), Chief Executive Officer of Port Authority, asking him to reconsider the Coalition's request and permit the Coalition to purchase "public-service advertising of its campaign to educate voters regarding their voting rights on PAT buses."  Jt. Exh. 2.  The Port Authority legal department was copied on the letter.

94.    After Hess received the letter, he reviewed Port Authority's advertising files and conducted additional legal research.  He also spoke with Hickton, Veraldi, Terry Henne, and other senior managers at Port Authority about the proposed ex-offender voting rights advertisement.

95.    On March 24, 2006, Hess sent a reply letter to the ACLU Legal Director Witold J. Walczak explaining Port Authority's refusal to place the advertisement.  ("Port Authority's Advertising Policy prohibits advertisements that are non commercial . . . . [T]he purpose of the ACLU's proposed advertising is explicitly non-commercial and is solely directed at education of potential voters. . . .") Jt. Exh. 2.  Neither Plaintiffs nor their counsel called Hess to discuss the Port Authority's response of March 24, 2006.

96.    Plaintiffs understood Hess's letter of March 24, 2006, to be the Port Authority's third rejection of their request to sponsor an ex-offender voting rights education advertisement.

97.    On August 10, 2006, Plaintiffs filed the instant lawsuit in which they allege that Port Authority created a designated public forum for advertisements on its vehicles through its widespread practice of accepting and running non-commercial advertisements; that the refusal of Port Authority and Hickton to run their ex-offender voting rights advertisements amounted to impermissible content-based discrimination and was not narrowly tailored to

promote a compelling government interest; and in the alternative, that the refusal of Defendants

to run the proposed ex-offender voting rights advertisement was unreasonable and viewpoint

discriminatory, especially in light of Port Authority having run similar non-commercial

advertisements from other organizations.[5]

       98.    Following the filing of this lawsuit, Plaintiffs were contacted by a local

billboard company which offered to post ex-offender voting rights advertisements on six

stationery billboards.

       99.    Thereafter, the ACLU received permission from the Maurice Falk Fund to

use the grant money it had received for bus advertisements to purchase billboard

advertisements.  Jt. Exh. 9.  Plaintiffs then purchased six billboards, which contained the logos

of both the League and the ACLU.  The billboard advertisements were on display in September

and October 2006.

       100.   The billboard ex-offender voting rights advertisement stated:  "Been to jail or

prison?  Vote Nov. 7.  It's Your Right.  For your family.  For our future." Jt. Exh. 21.  The

testimony at trial was that the message on the billboard advertisement was not the same as that

which would have been proffered for the bus advertisement.  Because the voter registration

deadline had passed, the billboard advertisement message did not mention voter registration.

---

[5]      On December 8, 2006, Plaintiffs filed an Amended Complaint in which they
provided the complete name of one party plaintiff and expanded the requested relief
to enjoin Defendants from treating Plaintiffs' advertisements differently from those
of similarly situated organizations, such as Women's Law Project, Fair Housing
Partnership, and Just Harvest.

101.    The billboard advertisement contained a telephone number for people with questions concerning voting rights.  Jt. Exh. 21.  Legal questions were to be referred to the ACLU.

102.    On November 3, 2006, Port Authority met with Plaintiffs and their counsel in Port Authority offices to discuss the proposed ex-offender voting rights advertisement. Attending on behalf of Port Authority were Steve Bland (the current CEO of Port Authority who had replaced Veraldi), Hess, and Judi McNeal (Hickton's direct supervisor).  Attending on behalf of Plaintiffs were Mosley, Witold J. Walczak, Legal Director - ACLU of Pennsylvania; Cooperating Attorneys Marc Sternberger and Jon Pushinsky, and Valerie McDonald Roberts, an Allegheny County elected official.

103.    Either immediately preceding this meeting or perhaps actually during this meeting, Plaintiffs were told for the first time that the Advertising Policy prohibition of political advertisements also factored into the decision of the Port Authority to deny their proposed advertisement.

104.    Port Authority, including Hickton, did not offer to co-sponsor Plaintiffs' advertisement, as they had with other organizations which had requested to run advertisements that Port Authority considered to be non-commercial.

105.    On August 14, 2008, the Court issued an Opinion and Order of Court in which it ruled on the parties' cross motions for summary judgment.  In the Opinion, the Court determined that Defendants' application of its Advertising Policy was reasonable with regard to Plaintiffs' proposed non-commercial ex-offender voter education advertisement.  Accordingly, the ultimate and only issue remaining for trial was the factual determination of whether

Defendants engaged in viewpoint discrimination in the application of the Policy when they rejected Plaintiffs' proposed ex-offender voter education advertisement.

106.    The testimony and evidence at trial conclusively demonstrated that WLP and the ACLU are distinctly similar organizations: they both provide free legal representation; they both handle civil rights issues and have, in fact, co-counseled cases; they both serve as co-counsel with private lawyers on some cases; and, when appropriate under statute, they both petition the court for an award of attorneys' fees and costs.

107.    However, Defendants did not make any entreaty or offer to Plaintiffs, as they had to the WLP to aid, assist, or work together in drafting an advertisement which would be acceptable under the Port Authority's policy.

108.    Defendants did not offer to co-sponsor the ex-offender voting rights advertisement because, according to Hickton, its message was not in line with and did not promote Port Authority business.

109.    Port Authority never inquired about the Plaintiffs' fee practices, as it had with the WLP.

110.    The Court finds that the advertisement proposed by Plaintiffs would have been very similar to other advertisements accepted by Port Authority, such as the advertisements sponsored by WLP, FHP /Commission, and Just Harvest, to name a few.

111.    The Court finds that the proposed ex-offender voting rights advertisement is no less commercial than many other advertisements including, but not limited to, the WLP, FHP / Commission, and Just Harvest advertisements that had been accepted and displayed by Port Authority.

112.    Port Authority's refusal to accept the proposed ex-offender voting rights advertisement is ongoing,

## CONCLUSIONS OF LAW

1.    The sole issue before the Court is whether Defendants engaged in viewpoint discrimination in having refused to accept Plaintiffs' ex-offender voting rights education advertisement for display on Port Authority buses.  Plaintiffs contend that Defendants' actions were unreasonable in light of the evidence that Defendants had accepted other non-commercial advertisements on similar rights-education topics.

2.    Viewpoint discrimination is "an egregious form of content discrimination" in which the "government targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors*, 515 U.S. 819, 828-29 (1995).

3.    The appropriate focus on the viewpoint discrimination inquiry examines whether the proposed speech deals with a subject that is otherwise permissible in the forum. *See Rosenberger*, 515 U.S. at 831.

4.    Accordingly, in this case, that means that the Court must initially determine if the proposed ex-offender voting rights education advertisement involved a subject that, through Port Authority's policy or practice, was allowed under the Advertising Policy.  If the subject of Plaintiffs' advertisement was within the approved category of information, the Court must next determine whether the rejection by Defendants of the advertisement constituted viewpoint discrimination.  *See Rosenberger,* 515 U.S. at 831.

5.      There is no requirement that Plaintiffs prove that Defendants acted out of any

personal animus for the Plaintiffs' viewpoint.  *See AIDS Action Comm. of Mass., Inc. v. Mass.*

*Bay Transp. Auth.*, 42 F.3d 1, 12 (1st Cir. 1994) ("Regardless of actual motivation, grave

damage is done if the government, in regulating access to public property, even appears to be

discriminating in an unconstitutional fashion."  *See also Child Evangelism Fellowship v.*

*Stafford Twp. Sch. Dist.*, 386 F.3d 514, 527 (3d Cir. 2004) ("[t]o exclude a group simply

because it is controversial or divisive is viewpoint discrimination.")

6.      Defendants have the burden of proving that they did not engage in viewpoint

discrimination by refusing to run Plaintiffs' proposed advertisement.  *See U.S. v. Playboy*

*Entm't Group, Inc*., 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the

Government bears the burden of proving the constitutionality of its actions.")

7.      At trial, Defendants contended that they rejected Plaintiffs' proposed

advertisement because it would violate the Port Authority's Advertising Policy.  Initially,

Defendants claimed that the proposed advertisement violated the Advertising Policy ban on

non-commercial advertising.  Defendants later and at trial contended that the proposed

advertisement would not only violate the ban on non-commercial advertising, it would also

violate the Policy ban on political advertising.


**Ban on Non-Commercial Advertising**

8.      The Court concludes that Defendants' first purported reason for rejecting the

proposed advertisement - its non-commercial content - is a pretext for viewpoint

discrimination. The testimony and evidence presented at trial clearly demonstrated that the

Defendants accepted numerous advertisements for display on Port Authority vehicles which had content similar to Plaintiffs' proposed advertisement and which were not truly commercial in nature.

9.      The testimony and evidence at trial established that Port Authority displayed numerous advertisements for free services on Port Authority buses.  Specifically, Women's Law Project advertised free legal help for young women; Just Harvest advertised free tax preparation services for low-income people; Fair Housing Partnership advertised free help for victims of housing discrimination; Tobacco Free Allegheny advertised free smoking-cessation sessions; and the Allegheny County Department of Human Services advertised free early-childhood education.

10.     The testimony and evidence at trial established that Plaintiffs' proposed advertisement would have included an offer of free services if Defendants had simply asked Plaintiffs to specify in the advertisement the kinds of services the Plaintiff organizations would provide ex-offenders who may need help in registering or exercising their right to vote.  In fact, the testimony and evidence at trial revealed that Plaintiffs would have offered almost identical legal services in their advertisement as the services offered in the advertisement which Port Authority helped develop and accepted from the WLP.

11.     Defendants have failed to provide a credible and convincing reason why they (i) rejected Plaintiffs' proposed advertisement out-of-hand rather than informing Plaintiffs of the unwritten requirement that advertisements needed to include offers for services in order to be considered commercial; or (ii) failed to request or review a proposed draft advertisement or otherwise work with Plaintiffs in the same way they collaborated with the WLP to help

Plaintiffs to develop an advertisement that would fit within the Advertising Policy of Port Authority.

12.     The testimony and evidence at trial also established that the educational content of the Plaintiffs' proposed advertisement would have been similar to the content of a number of educational advertisements that Port Authority accepted for display on its vehicles and in a number of instances Port Authority actually co-sponsored the advertisement which made it acceptable government speech.

13.     The purpose of Plaintiffs' proposed advertisement was to educate bus riders about the voting rights of Pennsylvania residents who were ex-offenders and had served a sentence of incarceration and to inform the public where to go for help if they experienced a problem exercising that right.

14.     The testimony and evidence at trial established that Port Authority accepted and displayed on its buses a number of advertisements specifically designed to educate bus riders about their rights and the rights of others, including advertisements about the rights of young women, the right of low-income people to tax credits, the right of dogs to be free from abuse, and the right of people to be free from housing discrimination, as well as advertisements designed to educate bus riders about the importance of reading to children and being vaccinated against meningitis and whooping cough.

15.     The Court rejects Defendants' attempts to narrow the subject of Plaintiffs' proposed advertisement by labeling it as speech on the subject of "voting rights" (and thus labeling it "political" and "non-commercial")  rather than "rights education."

16.     In order to prevail, Plaintiffs need not show that Defendants accepted advertisements with the exact opposite message or a related message on the exact issue. Rather, they must show that the Defendants accepted advertisements that discussed similar topics. *See AIDS Action Committee of Massachusetts, Inc. v. Massachusetts Bay Transp. Authority*, 42 F.3d 1, 10 (1st Cir. 1994).

17.     The Court finds that Defendants have not met their burden to provide a plausible view-point neutral rationale for accepting numerous advertisements on similar subjects, while rejecting the Plaintiffs' proposed advertisement.   The trial record, including testimony and evidence, demonstrates that the advertisements which were accepted and displayed from FHP, WLP, and Just Harvest have rights-education themes similar to Plaintiffs' rights-education message on its proposed advertisement.

18.     Accordingly, the Court concludes that Defendants' first justification for not accepting Plaintiffs' proposed advertisement is not plausible and is not sufficient to permit Defendants to bar Plaintiffs' speech from the bus advertising forum.


**Ban on Political Advertising**

19.     The testimony and evidence at trial also demonstrated that Defendants' second justification for rejecting Plaintiffs' proposed advertisement - that it was political - was based not on the subject matter of Plaintiffs' proposed advertisement - education about voting rights - but on Defendants' subjective belief that voting rights, specifically the right of people with criminal convictions to vote in Pennsylvania, is a controversial one.

31

20. During trial, Hickton defined "political advertising" as candidate campaign advertising and advertisements concerning ballot initiatives. The Court concludes that Plaintiffs' proposed advertisement does not advertise a political candidate, political campaign, political issue, or a ballot initiative.

21. Hickton also testified that all abortion advertisements are "political," even commercial advertisements for abortion-related health care issues. The Court concludes that Plaintiffs' proposed advertisement is not an abortion advertisement and the comparison is not aptly suitable.

22. Hess testified that "political" advertisements are those that "would advocate a particular political viewpoint. It would take a position on a political issue that's something of wide public debate or that is being broadly debated; . . . kind of a hot-button issue . . . ."

23. Plaintiffs' proposed advertisement was allegedly rejected based on the subjective opinion of Hickton and Hess that the advertisement dealt with a "hot-button" issue.

24. Defendants, however, failed to establish that Port Authority or its employees utilized any standards or objective criteria when determining whether a matter was a "hot-button issue." For example, the Advertising Policy fails to define the term "political" or "offensive" or provide any guidance to prospective advertisers or Port Authority employees about how to apply those terms.

25. The United States Court of Appeals for the Third Circuit has held that "[t]o exclude a group simply because it is controversial or divisive is viewpoint discrimination." *Child Evangelism Fellowship,* 386 F.3d at 527.

26.     The Court finds, based upon the testimony and evidence presented at trial, that the Defendants' rejection of the proposed advertisement constituted viewpoint discrimination because the decision was based on their subjective belief that the message of the proposed advertisement was controversial or a "hot button" issue.

27.     The testimony and evidence at trial established that Port Authority previously had accepted advertisements on the subject of rights-education.  Accordingly, Port Authority was prohibited from excluding Plaintiffs' advertisement based on its perceived controversial viewpoint.  *Rosenberger*, 515 U.S. at 829 (once the government had allowed speech on a particular subject in a nonpublic forum, the "state must respect the lawful boundaries it has itself set."

28.     Additionally, the testimony and evidence at trial reflects that the alleged political nature of the proposed advertisement was a post-hoc rationalization rather than the real basis of Defendants' actions.  The trial record reflects that Defendants did not explicitly refer to any alleged political nature of the proposed advertisement at the time they rejected it. Both Rachlin and Mosely testified that Hickton specifically referenced the Advertising Policy's commercial versus non-commercial distinction in rejecting the proposed advertisement. Moreover, Hess's letter to the ACLU repeatedly referred to the non-commercial nature of the proposed advertisement and made no mention whatsoever that it was also rejected as political.

29.     The Court concludes that Defendants' second purported reason for rejecting the proposed advertisement - it being political in nature - is based on Hickton's and the Port Authority's  viewpoint of the advertisement rather than its subject matter.   First, Plaintiffs' proposed advertisement does not meet any of the definitions of "political" that Defendants put

forth during trial ("political" being undefined in its policy).  Further, the testimony and evidence presented at trial demonstrates that Defendants accepted advertisements on the same or similar subject of Plaintiffs' advertisement - rights education - but rejected Plaintiffs' advertisement because of its alleged controversial perspective.  Lastly, even if the proposed advertisement could be considered "political" (which the Court rejected), this was a post-hoc rationalization (pretext) rather that the real basis of Defendants' rejection.

30.     Lastly, the Court concludes that Hickton was a person acting under color of state law with respect to his decision to reject Plaintiffs' proposed advertisement and is, therefore, a person subject to liability under 42 U.S.C. § 1983.

## PLAINTIFFS' REMEDIES

1.     Plaintiffs are entitled to injunctive relief by which Port Authority will be enjoined from refusing to accept a proposed "rights education" advertisement from Plaintiffs, patterned after the referenced Women's Law Project advertisement, and designed to inform the public about ex-offender voting rights in Pennsylvania.

2.     The Court concludes that Plaintiffs are also entitled to an award of damages for the actual out-of-pocket costs they incurred for the time that their employees were diverted from the performance of regularly assigned work tasks in order to respond to Defendants' rejection of their proposed advertisement and to vindicate Plaintiffs' rights.

3.     As a result of Defendants' refusal to consider, accept and display the ex-offender voting rights education advertisement, Plaintiffs were compelled to divert staff from

34

the performance of other duties to attempt to persuade Defendants to reverse course and, when that failed, to enforce Plaintiffs' First Amendment rights.

4.      The cost to Plaintiffs for the time and effort that their staff devoted to this matter regarding Defendants' final refusal to approve and display the proposed advertisement can be computed by multiplying the amount of time spent by each employee by his / her hourly wage.

5.      The Court finds that the ACLU is entitled to damages as follows:

| | |
|---|---|
| Barbara Fiege (13.7 hrs @ $33.45 /hr) | $ 458.27 |
| Susan McIntosh (5 hrs @ $12.75 /hr) | 63.75 |
| Lisa Rachlin (37 hrs @ $14.56 /hr) | 538.72 |
| **TOTAL** | **$1,060.74** |

6.      The Court finds that the League is entitled to damages as follows:

| | |
|---|---|
| Khari Mosley (30.7 hrs @ $20.00 /hr) | $ 614.00 |
| Lisa Rachlin (15 hrs @ $13.75 /hr) | 206.25 |
| **TOTAL** | **$ 820.25** |

7.      Title 42, United States Code, section 1988 provides that in a federal civil rights action under 42 U.S.C. § 1983 "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs."  The United States Supreme Court has mandated that a prevailing plaintiff "'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'" *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (quoting *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 (1968)).

8.     The Court finds that Plaintiffs are the prevailing party in this litigation and as such are presumptively entitled to an award of counsel fees, costs and expenses, unless special circumstances would render such an award unjust.


**CONCLUSION**

For the reasons hereinabove set forth, the Court concludes that Defendants have violated Plaintiffs' free speech rights as protected under the First and Fourteenth Amendments to the United States Constitution.  Accordingly, a verdict and  judgment are hereby entered in favor of Plaintiffs, Pittsburgh League of Young Voters Education Fund and American Civil Liberties Foundation of Pennsylvania and against Defendants, Port Authority of Allegheny County and Anthony J. Hickton, Director of Sales, for the relief and amounts set forth in this Memorandum Opinion.

An appropriate Order follows.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

PITTSBURGH LEAGUE OF YOUNG          )
VOTERS EDUCATION FUND and           )
AMERICAN CIVIL LIBERTIES            )
FOUNDATION OF PENNSYLVANIA,         )
                                    )
             Plaintiffs,            )
                                    )
      v.                            )      02: 06cv1064
                                    )
PORT AUTHORITY OF ALLEGHENY         )
COUNTY; and ANTHONY J. HICKTON,     )
Director of Sales,                  )

**ORDER OF COURT**

**AND NOW**, this 30th day of July, 2009, in accordance with the foregoing Findings

of Fact and Conclusions of Law, it is **ORDERED, ADJUDGED, AND DECREED** that a

verdict and judgment in this action is hereby entered in favor of Plaintiffs, Pittsburgh League of

Young Voters Education Fund and American Civil Liberties Foundation of Pennsylvania, and

against Defendants, Port Authority of Allegheny County and Anthony J. Hickton, Director of

Sales.

By this Order, Defendants are hereby **ENJOINED** from refusing to accept from

Plaintiffs a proposed "rights education" advertisement for display on its buses which will

inform the public about ex-offender voting rights in Pennsylvania as heretofore described in the

Plaintiffs' Remedies section of the Findings of Fact and Conclusions of Law.


Plaintiff, Pittsburgh League of Young Voters Education Fund, is entitled to monetary

damages from Defendants, jointly and severally, in the amount of $1,064.74.  Plaintiff,

American Civil Liberties Foundation of Pennsylvania, is entitled to monetary damages from

Defendants, jointly and severally, in the amount of $820.25.


Plaintiffs may file a Petition for Counsel Fees, Costs and Expenses on or before

**August 28, 2009.**  Defendants may file, if they so desire, a response in opposition thereto on or

before **September 18, 2009.**


BY THE COURT:

s/Terrence F. McVerry
United States District Court Judge


cc:        Jon Pushinsky, Esquire
           Email: jonpush@aol.com

           Witold J. Walczak
           ACLF of PA
           Email: vwalczak@aclupgh.org

           Sara Rose, Esquire
           ACLU
           Email: srose@aclupgh.org

           Gregory J. Krock, Esquire
           Buchanan Ingersoll & Rooney
           Email: gregory.krock@bipc.com


           Corrado Salvatore, Esquire
           Buchanan Ingersoll & Rooney
           Email: corrado.salvatore@bipc.com

           Joseph E. Starkey , Jr., Esquire
           Allegheny Energy, Inc.
           Email: jstark3@alleghenyenergy.com

           Michael J. Cetra, Esquire
           Port Authority of Allegheny County
           Email: mcetra@portauthority.org